IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BENNY O. IKO, et al.                     :

                                              :

    v.                                   : Civil Action No. DKC 2004-3731

                                              :

JON P. GALLEY, et al.                    :

                                              :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights wrongful death and survival action are the following motions by Defendants: (1) motion for partial summary judgment (paper 101), (2) motion to strike the report of Steve J. Martin (paper 111), and (3) motion to strike inmate letters (paper 112). The issues are fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, the motion for partial summary judgment will be granted in part and denied in part, the motion to strike the expert report will be denied, and the motion to strike the inmate letters will be denied as moot.

## I.  Background

This lawsuit arises from the death of Ifeanyi A. Iko ("Decedent"), on April 30, 2004, at the Western Correctional Institution ("WCI") in Cumberland, Maryland, after multiple correctional officers forcibly removed him from a prison cell (the

"cell extraction").[1]  Plaintiffs Dr. Benny O. Iko, Loreen Jones,
and Christine Iko[2] bring this action against Defendants[3].

The following facts are undisputed except where otherwise
noted.  Decedent, a long-time inmate, had been involved in several
violent incidents dating back to 1992, including assaults against
correctional officers and other inmates.  Some of the incidents
involved spitting and biting.  Decedent had also been
intermittently treated for mental health problems over several
years.  (Paper 101, Ex. 26).  On April 28, 2004, two days before
his death, Decedent engaged in an altercation with his cell mate in
Housing Unit 4.  The other inmate reported that Decedent had bitten
him and the nurse observed lacerations.  Prison officials used

---

[1] A cell extraction is a specific procedure used in prisons to
move an inmate from a cell to another area when the inmate refuses
to leave the cell voluntarily.  (Paper 101, Ex. 40, Saar Decl. ¶
3).  Its use in Maryland prisons is relatively rare.  (*Id.* ¶ 7).

[2] The complaint states that Dr. Iko is the brother of
Decedent, and he is bringing suit as the personal representative of
the Estate of Ifeanyi A. Iko; Ms. Jones is the former wife of
Decedent and she is bringing suit as the parent and next friend of
Benny Iko, the minor son of Decedent; and Christine Iko is the
adult daughter of Decedent.  The complaint is also filed "to the
use of" Lewechi Ijeoma Iko, mother of Decedent, and Ndukwe Amyim
Iko, adult son of Decedent, presently living in Nigeria.

[3] Defendants, Brian Clise, correctional officer; Paul F.
Defibaugh, correctional officer; Lyn Detrick, correctional officer;
Jon P. Galley, warden; Louise Gordon, chief of security; Allan
Hall, sergeant; Jason Harbaugh, correctional officer; Michael
Jacobs, lieutenant; Mark Raley, correctional officer; James Shreve,
lieutenant and Housing Unit 4 manager; Russell Suder, sergeant;
Robert Tichnell, captain; Adam Whitacre, correctional officer; and
Russell Zang, lieutenant, were all employees of WCI at the time of
the cell extraction.

pepper spray to break up the fight and Decedent was moved from his normally assigned cell to an isolation cell in that unit. Defendant James Shreve, manager of Housing Unit 4, had difficulty communicating with Decedent while he was in the isolation cell, causing Shreve to become "concerned about his behavior." (Paper 101, Ex. 28, Shreve Dep., at 47-48). Specifically, Decedent would not respond verbally to Shreve or he would respond in a foreign language. (*Id.* at 47). Shreve requested that someone from the psychology department visit Decedent. Bruce Liller from the psychology department met with Decedent on the morning of April 29. On April 30, two additional people from the psychology department, Dr. Janet Hendershot and Clarence Hawkins, met with Decedent.

Prior to the cell extraction, Dr. Hendershot and Defendant Captain Robert Tichnell tried to talk to Decedent for ten to twenty minutes, asking him to "cuff up" so that he could be transferred to Special Observation Housing ("SOH"). (Paper 101, Ex. 38, Whitacre Dep., at 30-31). Because Decedent would not cooperate, Defendant Louise Gordon, chief of security, recommended the cell extraction to move Decedent from Housing Unit 4 to SOH. (Paper 107, Ex. 22, Gordon Dep., at 11). Defendant Jon P. Galley, Warden, approved the use of a cell extraction. (*Id.*). The employees involved in the cell extraction were Defendants Shreve, Jason Harbaugh, Mark Raley, Adam Whitacre, Lyn Detrick, Brian Clise and Russell Suder (collectively, "extraction team"). The cell extraction began at

3

approximately 2:38 p.m. on April 30, 2004 and a video recording was made of the event.[4]

Immediately prior to the cell extraction, Decedent was lying passively on the floor of his cell.  The officers ordered Decedent to come to the door.  When he did not comply, Shreve administered two applications of pepper spray.  Decedent attempted to comply with the officers' orders to "cuff up" by presenting his hands through the cuff port.  Because Decedent presented his hands while facing forward, rather than from behind his back, Shreve administered another application of pepper spray.  From 2:41 to 2:46, Shreve administered a total of four separate applications of pepper spray.  Additionally, Suder applied a one-second burst of pepper spray from the rear window of the cell.  (Paper 107, Ex. 41, Suder Dep., at 19).  Plaintiffs' expert estimates that the pepper spray was dispersed for approximately nine to fourteen seconds in total.  (Paper 107, Ex. 1, at 18).  At all times prior to his extraction, Decedent appeared passive and non-confrontational.

Decedent lay still on the floor when the extraction team entered.  The extraction team secured his arms in metal handcuffs behind his back, placed his legs in shackles, and placed a spit

---

[4] The recording is, at times, only marginally viewable or audible.  At best, it provides a time line of events, with some illustration.

mask over his head.[5]  Plaintiffs allege that Shreve improperly tied the spit mask behind Decedent's head in contravention of the written instructions for use. (Paper 107, at 2, 32).  Defendants state that the spit mask was not tied. (*See, e.g.*, paper 107, Ex. 4, Shreve Dep., at 108, 158).  It appears that spit masks are not part of the standard equipment used in cell extractions (paper 101, Ex. 70 ¶ VI), but their use is authorized when the inmate has a history of spitting or biting (paper 107, Ex. 22, Gordon Dep., at 52).

Decedent was then taken to the Housing Unit 4 medical room for examination by health care staff.  Nurse Tammy Whisner recalled that when Decedent entered the medical room he was breathing normally and did not appear to be in distress. (Paper 101, Ex. 51, Whisner Dep., at 46-47).  Nurse Whisner described the following interaction:

> I explained to him that I was there to give him medical treatment.  I asked him if I could give him medical treatment.  He did not respond.  I asked him again if he wanted medical treatment and at that point he raised his head, he made eye contact with me for I would say at least 30 seconds, he stared at me and I asked him again if I could give him

---

[5]  The type of spit mask used on Decedent was a SpitNet(TM), manufactured by Nik Public Safety, Inc. (*See generally* paper 107, Ex. 3).  The spit mask is a hood that covers the wearer's face and head, it is fastened by tying two straps under the armpits and through two loops in the back.  A thin cloth, similar to the type used in doctors' surgical masks, covers the wearer's nose and mouth.  A mesh material covers the wearer's eyes and back of his head.

> medical treatment and he put his head down. .
> . . At that point I took that as he did not
> want medical treatment.  I didn't see any
> injuries or anything that appeared to be life
> threatening that he needed immediate medical
> treatment, so I released him to security.

(*Id*. at 47).  Defendants did not decontaminate Decedent in any way

nor did they remove the spit mask to examine Decedent.  No medical

treatment was given to Decedent.  While in the medical room,

Decedent collapsed forward and the officers restrained him and

placed him in a wheelchair for transportation to SOH.  The route

included time outside in fresh air.

Upon his arrival at SOH, Decedent was placed on his stomach in

holding cell 6.3A with the extraction team holding him down.  He

remained in this position, with various degrees of pressure applied

to his head, neck, shoulders, stomach, waist and legs, for

approximately ten minutes while flex-cuffs were located.  The

extraction team replaced his metal handcuffs with flex-cuffs and

exited the holding cell, leaving Decedent on his stomach, with his

arms restrained behind his back and with the spit mask still in

place.  Shreve instructed Defendant Paul Defibaugh, the SOH officer

on duty, that Decedent was to be on a 15-minute watch and that he

was not to remove the flex-cuffs or open the cell door unless a

minimum of three officers were present.

After the extraction team left, Defibaugh banged on the cell

door to ask Decedent if he wanted the flex-cuffs removed, but

Decedent did not respond.  Over a period of 45 minutes, Defibaugh

6

observed Decedent six times, for five to ten seconds at a time, and noted that Decedent had not moved at all.   After observing no movement for 45 minutes, Defibaugh called his superiors and medical staff to inform them of his concern.   Defibaugh also called Defendant Sergeant Allan Hall and told him that Decedent was unresponsive, Hall immediately joined Defibaugh at Decedent's cell. Defibaugh told Melissa Brashear, a medical staffer, that Decedent did not appear to be moving or breathing.   Defendant Lieutenant Michael Jacobs, nurse Cynthia Roser, and Ms. Brashear joined Hall in front of Decedent's cell.   Hall saw Decedent's shoulders rise and fall twice over a ten minute period.   Nurse Roser noted that Decedent was lying very still and asked to be allowed into the cell to check his pulse and "look him over." (Paper 107, Ex. 6, Roser Dep., at 35).   Nurse Roser asked to evaluate Decedent three times and was denied access to Decedent each time.   Defendant Jacobs, concerned about Decedent, called Captain William E. Dicken,[6] who had dispatched him to the scene, to request back-up so that he could enter the cell to check on Decedent.   Captain Dicken asked whether Decedent was breathing.   When Jacobs answered that the nursing staff said Decedent was breathing, Captain Dicken responded, "[i]f you can see movement, that's good enough for me." (Paper 107, Ex. 23, Jacobs Dep., at 50).   Defendant Captain Robert Tichnell, who was in the office with Captain Dicken at the time but

---

[6] Captain Dicken is not named as a Defendant in this suit.

was not on the phone call said, "[i]f he's breathing, if you can see movement, he likes to lure people in, leave him alone, he'll be okay." (*Id.*).  Jacobs announced to the others that they were not permitted to enter the cell.  The nurses, Hall, and Jacobs then left.  Defibaugh's shift ended shortly thereafter and he was replaced by Phillip Merling.

Merling observed Decedent and thought he was lying in a "very odd" position.  (Paper 107, Ex. 58, Merling Dep., at 50).  Merling called his supervisor, Defendant Russell Zang, and asked him to come over to look at Decedent.  Merling said that he did not express any urgency to Zang because Decedent appeared to be alive. (*Id.* at 53).  Merling then left to eat and was replaced by Officer Dwayne Grace.  Approximately 20 minutes later, Zang arrived and tried to get Decedent's attention by kicking the door a couple of times and yelling.  When he received no response, Zang entered Decedent's cell.  Zang checked Decedent's neck and wrist for a pulse, but could not find one.  (Paper 107, Ex. 11).  Zang removed the spit mask and observed that Decedent's right eye was protruding, his tongue was at the top of his mouth, and he was cold and rigid to the touch.  Zang ordered Officer Grace to call for medical assistance, which he did, and Zang began efforts to resuscitate Decedent.  Emergency medical personnel arrived but they were unable to save Decedent.

The medical examiner, Ana Rubio, M.D., performed an autopsy on Decedent and found the following:

> [Decedent] died of Asphyxia (the asphyxia was caused by chemical irritation of the airways by pepper spray, facial mask placement, compressional and positional mechanisms). . . . Autopsy revealed blunt force injuries to his face, back of the neck, left anterior shoulder, upper and lower extremities. There was no evidence of lethal blunt force injuries and the brain revealed only an old contusion. The manner of death is Homicide. . . .

(Paper 101, Ex. 77, at 10). Defendants' medical experts, Gary Vilke, M.D. and James Downs, M.D., opine that the cause of death was actually cardiac arrest, not asphyxia.[7] (Paper 101, Exs. 75 & 78). They further opine that the spit mask, pepper spray, and positioning did not contribute to the death. (*Id.*).

Plaintiffs filed a complaint in this court on November 22, 2004, alleging federal civil rights violations, state constitutional violations, and state torts. (Paper 1). Plaintiffs amended their complaint on March 30, 2005 (paper 17), and filed a motion for leave to file a second amended complaint on December 23, 2005. (Paper 59). The court granted in part and denied in part Plaintiffs' motion to file a second amended complaint. (Paper 79). Plaintiffs filed their second amended complaint with the authorized amendments on July 18, 2006, containing the following counts: Count

---

[7] Both experts reviewed a number of documents in the process of preparing their reports, including Dr. Rubio's autopsy report and a video of the cell extraction.

I, violation of 42 U.S.C. § 1983; Count II, violation of the
Maryland Constitution; Count III, assault and battery; Count IV,
intentional infliction of emotional distress; Count V, wrongful
death; Count VI, survival action; and Count VII, gross negligence.
(Paper 87).  Defendants filed the instant motion for partial
summary judgment as to Counts I, II, III, IV and VII, on January
22, 2007. (Paper 101).  Plaintiffs' opposition was filed on March
21, 2007.  (Paper 107).  Defendants filed motions to strike a
number of Plaintiffs' exhibits, including the expert report and
several inmate letters.  (Papers 111 & 112).  Plaintiffs opposed
the motions to strike.  (Paper 114).  The issues are now briefed
and ready for disposition.

## II.  Standard of Review

It is well established that a motion for summary judgment will
be granted only if there exists no genuine issue as to any material
fact and the moving party is entitled to judgment as a matter of
law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986).  In other words, if there clearly exist factual issues
"that properly can be resolved only by a finder of fact because
they may reasonably be resolved in favor of either party," then
summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see
also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.
1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.

1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  Motions to Strike

Defendants argue that the report of Plaintiffs' expert Steve J. Martin should be stricken because it contains impermissible legal opinions and conclusions, his characterization of the events of April 30, 2004 are "factually suspect," and his concluding opinion is "completely lacking in credibility."   (Paper 111). Defendants do not challenge Martin's qualifications as an expert.[8]

On a motion for summary judgment, a district court may only consider evidence that would be admissible at trial.  *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 973 (4th Cir. 1990). Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

[8]   Martin is qualified by his knowledge, experience, and training to offer his expert opinion in this case, having worked in the field of corrections for over 30 years.  During his career, Martin has at times served as a correctional officer in state prison, served as legal counsel for the Texas Department of Corrections, reviewed and/or assisted in the development of use-of-force policies and procedures for correctional facilities across the United States, investigated claims of misuse of force for the United States Department of Justice, served as a court-appointed monitor in class action lawsuits involving use-of-force claims, and testified as an expert in the field of corrections in over forty federal cases.  (Paper 107, Ex. 1).

Admissibility is determined under now familiar principles:

> In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), this Court focused upon the admissibility of scientific expert testimony.  It pointed out that such testimony is admissible only if it is both relevant and reliable.  And it held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*, at 597, 113 S.Ct. 2786.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  In *Kumho*, the Court clarified that the *Daubert* approach applies to experts who are not scientists.  With respect to excessive force cases in particular, the United States Court of Appeals for the Fourth Circuit has held, with regard to the relevancy prong that:

> As a general proposition, the "objective reasonableness" standard [used in excessive force cases] may be comprehensible to a lay juror.  On the other hand, any "objective" test implies the existence of a standard of conduct, and, where the standard is not defined by the generic - a reasonable *person* - but rather by the specific - a reasonable *officer* - it is more likely that Rule 702's line between common and specialized knowledge has been crossed.
>   The district court seems to have deduced a blanket rule that expert testimony is generally inappropriate in excessive force cases from *Wells v. Smith*, 778 F.Supp. 7 (D.Md. 1991).  To the contrary, expert testimony has often been admitted in such cases.  *Davis v. Mason County*, 927 F.2d 1473, 1484-1485 (9th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991); *Samples v. City of Atlanta*, 916 F.2d 1548, 1551-1552 (11th Cir. 1991); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1551 (11th Cir.

> 1989) (expert testimony concerning expected
> dog bite ratios in canine units); *Kladis v.
> Brezek*, 823 F.2d 1014 (7th Cir. 1987).
> Nonetheless, a blanket rule that expert
> testimony is generally admissible in excessive
> force cases would be just as wrong as a
> blanket rule that it is not.
> The facts of every case will determine
> whether expert testimony would assist the
> jury. Where force is reduced to its most
> primitive form – the bare hands – expert
> testimony might not be helpful. Add
> handcuffs, a gun, a slapjack, mace, or some
> other tool, and the jury may start to ask
> itself: what is mace? what is an officer's
> training on using a gun? how much damage can a
> slapjack do? Answering these questions may
> often be assisted by expert testimony.

*Kopf v. Skyrm*, 993 F.2d 374, 378-79 (4th Cir. 1993) (emphasis in original).

Here, Martin offers his opinion on the use of a chemical agent, the use of a spit mask, the use of physical restraints, and the standard of care within prisons for providing medical treatment to inmates. These topics are sufficiently specialized that expert testimony would be helpful in this case.

Defendants' first argument that the report contains impermissible legal opinions and conclusions fails because Martin's specific findings as enumerated A – N (paper 107, Ex. 1, at 8-11) are not legal opinions or conclusions. These opinions reflect Martin's expert analysis of the events preceding Decedent's death, including whether the officers' actions placed Decedent in a substantial risk of harm, were performed with a valid penological purpose, and whether those actions violated the standard of care

14

within prisons.  "An opinion is not objectionable simply 'because it embraces an ultimate issue to be decided by the trier of fact. . . .'" *Kopf*, 993 F.2d at 377-78 (quoting Fed.R.Evid. 704(a)).  To the extent that Martin's conclusion states that the officers behaved recklessly or wantonly (paper 107, Ex. 1, at 28), that opinion may be construed as a legal conclusion and will not be considered by the court.  Defendants' second and third arguments simply go to the witness' credibility and are not proper bases for striking the report.  Defendants' motion to strike the expert report (paper 111) will be denied.

Second, Defendants move to strike several inmate letters, specifically, exhibits 21, 25, 26, 28, 29, 30, 31, 32, 34, 35, 37, and 65.[9]  (Paper 112).  Although the court has reviewed these exhibits, they do not affect resolution of the motion for summary judgment.  They will not be considered, and any further evidentiary use will be subject to later determination.  Defendants' motion to strike inmate letters will be denied as moot.

## IV. Section 1983 Claims

Plaintiffs allege in Count I that Defendants acted under color of state law to deprive Decedent of his rights under the Eighth and Fourteenth Amendments.  Specifically, Plaintiffs allege that the following rights were violated: "(a) the right to be free from

---

[9] The motion to strike, in error, also included Plaintiffs' exhibit 36.  Defendants have clarified that they do not wish to strike exhibit 36.  (Paper 120, at 1).

excessive and unreasonable force and seizure; (b) the right to be free from deprivation of life and liberty without due process of law; (c) the right to be free from cruel and unusual punishment; and (d) the right to be free from deliberate indifference for medical need." (Paper 87 ¶ 32). They also delineate several aspects of the events as separate violations of those rights. In some respects, Plaintiffs' approach results in redundant analysis and will be streamlined. Part (a) will be construed to allege a claim for excessive force during the course of the cell extraction. Plaintiffs have not, however, alleged a procedural due process violation and substantive due process claims by prisoners are more properly brought under the Eighth Amendment. "[I]t is now well established that the Eighth Amendment serves as the primary source of substantive protection to convicted prisoners, and the Due Process Clause affords a prisoner no greater substantive protection than does the Cruel and Unusual Punishments Clause." *Williams v. Benjamin,* 77 F.3d 756, 768 (4th Cir. 1996) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Thus, part (b) is encompassed by Plaintiffs' more specific Eighth Amendment claims under (a) and (d), and will not be separately considered. Similarly, "(c) the right to be free from cruel and unusual punishment" is redundant of the more specific claims stated in (a) and (d) and does not aid the analysis as a separate claim. Accordingly, Count I of Plaintiffs'

complaint will be read to state claims under the Eighth Amendment for excessive force and deliberate indifference to medical need.

In the opposition to the motion for summary judgment, Plaintiffs claim that the following acts constituted an improper use of force and cruel and unusual punishment: (1) the decision by Galley and Gordon to authorize the cell extraction; (2) the use of a spit mask by the extraction team; (3) the conduct of the extraction team in securing Decedent in restraints; (4) the use of pepper spray by Shreve; (5) the application of pressure by the extraction team to Decedent while he was cuffed and lying prone on the floor; (6) the deliberate indifference by the extraction team to Decedent's medical needs prior to his transfer to SOH; (7) abandonment of Decedent's health care needs by Jacobs, Defibaugh, Hall, Tichnell, and Zang, while Decedent was housed in SOH; and (8) the fostering of an environment by Galley and Shreve where correctional officers could act with impunity. (Paper 107, at 27). Plaintiffs did not allege in their second amended complaint that the decision by Galley and Gordon to authorize the cell extraction was unconstitutional, and thus it is not properly before the court. *See Ultrasound Imaging Corp. v. Am. Soc. of Breast Surgeons*, 358 F.Supp.2d 475, 480 (D.Md. 2005) ("[Plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."). The remaining claims are in the complaint.

17

Defendants' motion contains an extensive statement of facts and then argument that does not differentiate among the defendants. Instead, Defendants assert generally, as to the federal claims, that there was no excessive use of force, that the use of pepper spray did not constitute excessive force, that there was no apparent need for medical attention, so there was no deliberate indifference, and, alternatively, that they are entitled to qualified immunity. Defendants also contend that the state constitutional and common law claims fail factually or based on immunity.

The claims will be discussed in three sections, as follows. The first section will discuss the Eighth Amendment excessive force claims, specifically (a) securing Decedent in restraints; (b) the use of pepper spray; and (c) the application of pressure to Decedent while lying on the floor. The second section will discuss the Eighth Amendment deliberate indifference to medical need claims, specifically (a) the use of a spit mask; (b) Decedent's medical treatment prior to the transfer to SOH, and (c) Decedent's medical treatment while housed at SOH. The third section will discuss whether Galley and Shreve are liable as supervisors under 42 U.S.C. § 1983.

## A. Qualified Immunity

Defendants assert that they did not violate Decedent's constitutional rights, but even if his rights were violated,

Defendants are entitled to summary judgment based on qualified immunity.  Qualified immunity:

> protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). Thus, government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

*Short v. Smoot*, 436 F.3d 422, 426-27 (4th Cir. 2006).  In considering qualified immunity:

> The threshold question that a court must first answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established;" that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Mazuz v. Maryland*, 442 F.3d 217, 225 (4th Cir. 2006)(quoting *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001))(internal citations omitted). *See also Owens ex rel. v. Lott,* 372 F.3d 267, 273 (4th Cir. 2004),

*cert. denied*, 534 U.S. 1050 (2005); *Henderson v. Simms,* 223 F.3d 267, 271 (4th Cir. 2000), *cert. denied*, 531 U.S. 1075 (2001); *Vathekan v. Prince George's County,* 154 F.3d 173, 179 (4th Cir. 1998).

A right is clearly established "when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)). The exact action in question need not have been held to be unlawful "because 'general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decision law may apply with obvious clarity to the specific conduct in question.'" *Ridpath*, 447 F.3d at 313 (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)); *Owens*, 372 F.3d at 279. The court therefore must consider "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle involved." *Owens*, 372 F.3d at 279 (quoting *Amaechi v. West*, 237 F.3d 356, 362-63 (4th Cir. 2001)). The key issue is whether the law, when the events in question occurred, "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath*, 447 F.3d at 313.

**B.  Excessive Force**

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.  "This protection, enforced against the states through the Fourteenth Amendment, protects inmates against the application of excessive force by correctional officers." *Stanley v. Hejirika*, 134 F.3d 629, 633-34 (4th Cir. 1998) (citing *Whitley*, 475 U.S. at 318-19). "Not every unpleasant action taken by prison officials against inmates, however, violates the Eighth Amendment." *Stanley*, 134 F.3d at 634.  "After incarceration, only the unnecessary and wanton infliction of pain constitutes . . . cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley*, 475 U.S. at 319 (internal quotation marks omitted).

To succeed on any Eighth Amendment claim for cruel and unusual punishment, a prisoner must prove: (1) objectively the deprivation of a basic human need was sufficiently serious, and (2) subjectively the prison officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  In this case, the objective component is satisfied - the loss of life is a "sufficiently serious" deprivation of a basic human need.

The focus of the inquiry will be on whether each Defendant acted with a "sufficiently culpable state of mind."  The Fourth Circuit explained that, when evaluating whether evidence is legally

sufficient to satisfy the subjective component, "a court may allow an inmate's claim to go to the jury only if it concludes that the evidence, viewed in a light most favorable to the claimant, 'will support a reliable inference of wantonness in the infliction of pain.'" *Stanley*, 134 F.3d at 634 (quoting *Whitley*, 475 U.S. at 322).  In determining whether the use of force was wanton and unnecessary, "it may also be proper to evaluate [1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat 'reasonably perceived by the responsible officials,' and [4] 'any efforts made to temper the severity of a forceful response.'" *Hudson v. McMillian*, 503 U.S. 1, 7 (1993) (quoting *Whitley*, 475 U.S. at 321).

The Supreme Court cautioned that prison administrators must be accorded "wide-ranging deference" to design and implement policies and practices that in their judgment are necessary for the preservation of order and security. *Whitley*, 475 U.S. at 321-22. "It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.*

### 1. Use of Restraints

Plaintiffs allege that the use of metal handcuffs, shackles, and a spit mask on a passive inmate, Decedent, during and after the

cell extraction by the extraction team, constituted excessive force under the Eighth Amendment. (Paper 87 ¶ 18).

Defendants' use of restraints was in accordance with correctional policies. Correctional officers are trained to handcuff an inmate behind his back to reduce the possibility of violence. (Paper 101, Ex. 66 & Ex 28, Shreve Dep., at 84). The Maryland Division of Correction guidelines for use of mechanical restraints permit their use during transport or movement of an inmate within the institution, as here. (Paper 101, Ex. 72, at 6).

Although Decedent appeared passive prior to his cell extraction, he was quite strong and had a history of violent behavior while incarcerated. For example, Decedent severely bit two other inmates and a correctional officer and stabbed a correctional officer with a hand made weapon. (*See* paper 101, Exs. 2-4, 9-11). It was Defendants' judgment that, given Decedent's violent history and previous biting incidents, mechanical restraints and a spit mask were necessary to preserve security during the cell extraction.

Correctional personnel are to be accorded "wide-ranging deference" to design and implement policies and practices that in their judgment are necessary for the preservation of order and security. *See Whitley*, 475 U.S. at 321-22. The court will not substitute its own judgment for that of the officials who made a considered choice. *See id*. The amount of force used by securing

23

Decedent in restraints during the cell extraction was reasonable in relation to the perceived threat. *See Hudson*, 503 U.S. at 7.  Once Decedent was transported safely to SOH, Defendants removed the leg shackles and replaced the metal handcuffs with plastic flex cuffs. (Paper 107, Ex. 44, Whitacre Dep., at 60).  Also, once they had exited the cell, Defendants offered to remove the flex cuffs, but Decedent did not respond to their offer.  Defendants thus made an effort to temper the severity of the force used.  *Id.*  Defendants did not inflict unnecessary and wanton pain and suffering on Decedent by securing him in restraints during and after the cell extraction.  Accordingly, there was no violation of his Eighth Amendment rights in this regard.

## 2. Use of Pepper Spray

Plaintiffs assert that Defendant Shreve's use of pepper spray constituted excessive force because he sprayed a large quantity on Decedent while Decedent was passive and Decedent received no subsequent decontamination.  Prior to the cell extraction, Decedent was lying passively on the floor.  Defendants ordered Decedent to "cuff up."  When Decedent did not comply, Shreve administered two applications of pepper spray through the cuff port and Suder administered one application of pepper spray from the rear window. Decedent, facing forward, then presented his hands through the cuff port.  Shreve administered another application of pepper spray. Plaintiffs' expert estimates that, in total, Defendants dispersed

the pepper spray for approximately nine to fourteen seconds. (Paper 107, Ex. 1, at 18). Defendants do not dispute this estimate. Decedent did not display any outward reaction to the pepper spray, such as coughing, gagging, labored breathing, or watery eyes. Defendants did not decontaminate Decedent in any way following the application of pepper spray. In fact, Decedent received no medical treatment until over an hour after the application of pepper spray, when he was discovered without a pulse and efforts were made to resuscitate him.

In order to succeed on the claim of excessive force, Plaintiffs must show that Defendants "inflicted unnecessary and wanton pain and suffering." *Whitley*, 475 U.S. at 320. To determine whether the pain inflicted was unnecessary and wanton, a court should consider "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. "'[S]uch factors as the need for application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted' are relevant to that ultimate determination." *Id.* (citation omitted). "It is generally recognized that 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" *Williams*, 77 F.3d at 763

(quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984), *cert. denied*, 470 U.S. 1085 (1985)).

The first factor is the need for the application of force. The Maryland Division of Corrections Directive governing the use of force, DCD 110-23, permits the use of pepper spray in a forced cell extraction such as this. (Paper 107, Ex. 43, at 7). Plaintiffs' expert, Steve J. Martin, stated that pepper spray is commonly used in cell extractions. He explained, "it's used as a defensive and incapacitating type of nonlethal weapon, [] its purpose is not to render somebody into absolute literal physical submission, . . . it's a diversion[,] temporarily incapacitating [the inmate] to assist the cell extraction team in subduing that inmate." (Paper 107, Ex. 63, Martin Dep., at 49). Thus, some use of force was warranted, and the initial application of pepper spray was not unnecessary.

Decedent, however, was passive at all times prior to and during the cell extraction, thus implicating the second factor, the relationship between the need for force and the amount of force used. Plaintiffs' expert states that, generally, pepper spray would be dispersed for only one to three seconds under these circumstances, *i.e.*, against a single, unarmed inmate locked securely in a confined cell space. (Paper 107, Ex. 1, at 18). It is not at all clear that Shreve needed to deploy the pepper spray for nine to fourteen seconds given that Decedent was not

26

confrontational and, in fact, attempted to comply with the officers' orders. Shreve stated that he was trained to re-deploy the pepper spray until "the condition changes, either the inmates comply or the situation changes." (Paper 101, Ex. 28, Shreve Dep., at 166). After Decedent attempted to comply with Defendants' orders, by presenting his hands through the cuff port, Shreve administered yet another burst of pepper spray. Thus, it appears that Shreve did not adhere to his own training to cease deploying the pepper spray once the inmate complies. Defendants do not allege that Decedent became confrontational or violent such that additional pepper spray was needed to subdue him.

The threat reasonably perceived by the responsible officials, the third element, must have diminished during the course of the cell extraction. Defendants observed that Decedent was passive for several minutes. He did not react to the pepper spray and did not become confrontational or violent. After observing Decedent to be passive for several minutes, the threat reasonably perceived by Defendants diminished.

The final factor looks at Defendants' efforts to temper the severity of a forceful response. Directive 110-23 states that chemical agents may be used to effect a forced cell extraction, as here. (Paper 107, Ex. 43, at 7). The Directive goes on to state that "[m]edical treatment *shall* be given to all persons exposed to chemical agents[.]" (*Id*. at 8) (emphasis added). Defendants did

27

not decontaminate Decedent in any way, despite the mandate that any person subjected to chemical agents "shall" receive medical treatment.  The Directive further states that "[o]nly the <u>minimal</u> amount of chemical agents necessary shall be used in a given situation." (*Id*. at 8) (emphasis in original).  Shreve used more than the minimal amount of pepper spray.  Shreve's violation of the prison's own regulations supports an inference of bad intent.  *See Miller v. Leathers*, 913 F.2d 1085, 1088 (4th Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991).  Defendants generally, and Shreve in particular, made no effort to temper the severity of force used. As noted above, some use of force was warranted under these circumstances.  A reasonable jury could find, however, that five applications of pepper spray against a passive inmate who received no subsequent medical attention or decontamination efforts, was forced to wear a spit mask, and died from asphyxia less than two hours later, is sufficient to support an excessive force claim under the Eighth Amendment.  Thus, the facts taken in the light most favorable to Plaintiffs could support a finding that Defendant Shreve violated Decedent's constitutional right.

The next and final step is to determine whether the right was clearly established; if it was not clearly established, Shreve would be entitled to qualified immunity.  *See Mazuz*, 442 F.3d at 225 ("if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether

the right was clearly established[.]"").  The key issue is whether the law, when the events in question occurred, "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath*, 447 F.3d at 313.  The exact action in question need not have been held to be unlawful because general statements of the law are capable of giving fair and clear warning, and a general constitutional rule may apply with obvious clarity to the specific conduct in question.  *Id.*  The Fourth Circuit on several occasions discussed the use of chemical agents within prisons prior to the incident in question.

In *Williams v. Benjamin*, the defendant correctional officers applied mace to inmates who were throwing unidentified liquid out of the food service windows in their cells.  *Williams*, 77 F.3d at 759.  After the first application of mace, the inmates ceased their actions, and the plaintiff, Williams, began yelling in pain from the burning of the mace.  The defendants refused to let Williams wash the mace from his eyes, face, or body.  Williams was left for eight hours in four-point restraints in his cell, which had been emptied of all his belongings, including his bed.  *Id.* at 760.  The Fourth Circuit held that confining an inmate in four-point restraints for eight hours, without permitting him to wash off mace, use a toilet or receive medical attention, could constitute an Eighth Amendment violation, reversing the district court's entry of summary judgment in favor of the correctional officers.

In *Grayson v. Peed*, an intoxicated detainee, Collins, attempted to crawl out of his holding cell and was sprayed with pepper spray. *Grayson*, 195 F.3d 692, 694 (4th Cir. 1999). The following morning Collins was again acting belligerently and the officers attempted to spray him with pepper spray a second time. A cell extraction team moved him to another cell. A few minutes later, Collins appeared to be unconscious. Medics checked his pulse on two occasions and observed that he was okay. Another officer then noticed that Collins was not breathing. He was taken to the hospital, and a neurologist found him to be brain dead; the following day he was taken off life support and pronounced dead. The Fourth Circuit found that the officers' use of pepper spray was not excessive force because Collins's attempt to force his way out of the cell necessitated such use. *Grayson*, 195 F.3d at 696. Furthermore, the court found that the defendants were not deliberately indifferent to Collins's medical needs although they twice failed to clean pepper spray off of him in a timely manner. The court determined that the defendants' failure to clean off the pepper spray was not deliberate indifference because, after the first use, Collins responded by yelling and kicking at the officer's offer to wash the spray off and, after the second use, Collins was rushed to the hospital within such a short time thereafter that the officers could not have been expected to have cleaned off the pepper spray residue. *Id.*

In *Jackson v. Morgan*, an unpublished disposition, the Fourth Circuit reversed a jury verdict in favor of the plaintiff, holding that no reasonable jury could find the force used in that case was excessive because the force used was not "repugnant to the conscience of mankind" and the plaintiff had not shown more than *de minimis* injury. *Jackson v. Morgan*, 19 F.App'x. 97, 102-03 (2001) (2-1 decision), *cert. denied*, 535 U.S. 970 (2002). The inmate, Jackson, had been causing a disturbance and the shift commander ordered that he be placed in an isolation cell. Jackson was ordered to remove his clothing for inspection, which he did. Jackson refused to comply with the other removal procedures and the defendants administered twelve bursts of pepper spray at three different times. *Id.* at 99. After removal, Jackson was taken to the medical department for treatment. The nurse washed his head under running water and allowed him to wipe his groin with wet paper towels. He was provided with clean underwear and left in three-point restraints for two days. In determining that Jackson's injury was *de minimis*, the Fourth Circuit specifically distinguished it from the precedent in *Williams*, noting that the chemical spray in *Williams* was CS tear gas, and the chemical spray used on Jackson was OC pepper spray. "Pepper spray is a milder irritant and is employed to avoid physical confrontation among inmates and guards; whereas CS tear gas was used primarily as a weapon with greater consequences and required more thorough

31

decontamination." *Id.* at 102.  The court also noted that Jackson's decontamination was adequate.  In a strongly worded dissent, Judge Diana Gribbon Motz wrote that she would affirm the jury verdict and that "in significant respects the facts [in *Jackson*] evidence a more, not less, egregious infliction of unnecessary pain" than the facts in *Williams*.  *Id.* at 108.

The facts of this case are obviously not identical to the cases described above.[10]  Here, Decedent was completely passive prior to the applications of pepper spray.  In the cases cited above the plaintiff was physically resisting, *see Grayson*, 195 F.3d at 694, or creating a disturbance, *see Williams*, 77 F.3d at 759; *Jackson*, 19 F.App'x. at 99.  In each case, the court cited the physical resistance or creation of a disturbance as justifications for the use of chemical agents.  The existing case law, and indeed the prison's own regulations, gave Defendant Shreve fair warning that multiple applications of pepper spray against a passive inmate who made at least some attempt at compliance, received no subsequent decontamination, and was forced to wear a spit mask, was unlawful.  Shreve is not entitled to qualified immunity for his use of pepper spray.  Accordingly, Defendants' motion for summary judgment will be denied on this claim.

---

[10] As aptly noted by Judge Motz, "Cases seldom present identical facts . . ." *Jackson*, 19 F. App'x at 108.

### 3. Application of Pressure to Decedent

Plaintiffs allege that Defendants used unconstitutionally excessive force by applying significant pressure to Decedent's head, neck, shoulders, stomach, waist, and legs for approximately ten minutes "while he was cuffed and compliant and lying prone on the floor" as Defendants attempted to locate flex cuffs to replace Decedent's metal handcuffs. (Paper 107, at 27, 36). Defendants have not directly addressed this aspect of Plaintiff's claim.

The extraction team Defendants all testified that they did not hit, kick, or strike Decedent. (Paper 101, Exs. 43-49). Defendant Whitacre stated that he did kneel on Decedent to keep his body still. (Paper 107, Ex. 44, Whitacre Dep., at 38).

Mr. Martin, Plaintiffs' expert, attributes the pressure exerted by Defendants at this time to the "compressional and positional mechanisms" cited as one of several causes of death by the medical examiner. (Paper 107, Ex. 1, at 21) (citing medical examiner's report, attached to paper 101, Ex. 77, at 10). Mr. Martin wrote:

> The amount of forceful pressure and body weight exerted on the decedent by security personnel to particularly vulnerable areas of his body, while he was on his stomach cuffed from behind with a spit mask covering his airways for an extraordinary length of time, in order to replace metal cuffs with flex-cuffs, created a needless risk of harm to the health and safety of the [D]ecedent in the absence of an immediately necessary tactical security objective.

33

(Paper 107, Ex. 1, Martin Report, at 10).  Defendants' expert, Gary M. Vilke, M.D., agreed that Decedent "was restrained in a prone position with a certain amount of weight force being placed on his back by officers to maintain him in a safe position." (Paper 101, Ex. 75, Vilke Report, at 3).  He explained that Decedent "was held by both ankles and with control of both shoulders.  At times the weight was being placed by two individuals on the shoulders, pushing with hands, and at times with a single individual.  There was some weight over his lower back at times as well." (*Id.*).

Dr. Vilke disputed, however, that this pressure contributed to Decedent's death in any way.

> During the handcuff transfer, [Decedent] was moving and at the time of release of control, reports reflect that he was breathing and that he even mumbled something . . . Given that [Decedent] was very much alive when the officers left the cell and was still breathing over twenty minutes later as noted by direct nursing observation, and that there were no findings or changes consistent with asphyxia on autopsy, the weight force on the back did not cause [Decedent's] death.

(*Id.*).  Defendants' other medical expert, James Claude Upshaw Downs, M.D., reported that it was unlikely that the force exerted during this time contributed to the compressional or positional asphyxia noted in the autopsy because  "death logically would have happened in more direct temporal association with the active events, as the decedent's oxygen consumption would have been much greater when the active events were transpiring. . . interruption

of oxygen to the brain [causes] loss of consciousness . . . in relatively short order - 15 to 20 seconds." (Paper 101, Ex. 78, Downs Report, at 4).

On this record, it is not possible to determine as a matter of law whether Defendants "inflicted unnecessary and wanton pain and suffering." *Whitley*, 475 U.S. at 320. Defendants held Decedent down for approximately ten minutes, possibly in a good faith effort to maintain control while flex cuffs were located to replace his metal handcuffs. On the other hand, Plaintiffs question why the flex cuffs were not more readily available. Decedent was not resisting and had been passive throughout the events. Defendant Jacobs testified that Decedent "was the strongest inmate I've ever come across in my career." (Paper 101, Ex. 57, Jacobs Dep., at 41). Jacobs also testified that he had seen Decedent "step through" both flex cuffs and handcuffs on previous occasions.[11] (*Id*. at 52). Decedent's strength and ability to manipulate restraints may have rendered it necessary for several officers to participate in holding Decedent for this period of time. Defendants argue that Decedent did not appear to suffer any immediate injuries from the pressure exerted at this time and that he was clearly alive when Defendants exited the cell after

---

[11] Jacobs described the process of "stepping through" cuffs: "Hands behind his back, he can get his hands down underneath his rear end and come up under his legs and have them in front of him. If he gets his hands in front of him, then, you know, the game is on." (Paper 101, Ex. 57, Jacobs Dep., at 52).

replacing his metal handcuffs with flex cuffs. Defendant Raley testified that, when Defendants were ordered to leave the cell, Decedent was "trying to get up off the floor" and that he "was moving around." (Paper 107, Ex. 46, Raley Dep., at 99). Defendant Defibaugh also testified that immediately after the extraction team left, he observed Decedent breathing. (Paper 107, Ex. 49, Defibaugh Dep., at 71). Defendants contend that they secured Decedent by applying pressure to his body for a very limited time and the force used was commensurate with the officers' need for security. Given the conflicting inferences from the record, summary judgment will be denied on this aspect of Plaintiff's claim.

## C. Deliberate Indifference to Medical Need

"[W]hen an inmate claims that prison officials failed to provide him with adequate medical care or that conditions of confinement constitute cruel and unusual punishment, he must demonstrate that prison officials acted with 'deliberate indifference' in order to state an Eighth Amendment claim." *Williams*, 77 F.3d at 761 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson*, 195 F.3d at 695. The Fourth Circuit explained:

> An officer is deliberately indifferent to a substantial risk of harm to a detainee when that officer "knows of and disregards" the risk. *Farmer v. Brennan*, 511 U.S. 825, 837,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to be liable under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Stated somewhat differently, "[d]eliberate indifference requires a showing that the defendants *actually knew of* and *disregarded* a substantial risk of serious injury to the detainee or that they *actually knew of* and *ignored* a detainee's serious need for medical care." *Young*, 238 F.3d at 575-76 (emphases added).

Liability under this standard thus requires two showings. First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." *Id.* As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (emphasis in original).

## 1. Use of Spit Mask

Plaintiffs contend that the extraction team's use of a spit mask on Decedent under these circumstances violated Decedent's rights because it placed him in a substantial risk of harm to which

Defendants were deliberately indifferent.[12]   The type of spit mask used on Decedent was a SpitNet(TM), manufactured by Nik Public Safety, Inc.   (*See generally* paper 107, Ex. 3).   The spit mask is a hood that covers the wearer's face and head, it is fastened by tying two straps under the armpits and through two loops in the back.   A thin cloth, similar to the type used in doctors' surgical masks, covers the wearer's nose and mouth.   A mesh material covers the wearer's eyes and back of his head.   The instructions accompanying the spit mask read, "WARNING: IMPROPER USE OF SPIT NET MAY CAUSE INJURY OR DEATH. . . Wearer must be under constant visual supervision and should NEVER be left unattended.   DO NOT USE on anyone that is . . . having difficulty breathing. . . ."   (Paper 107, Ex. 3) (emphasis in original).   Defendant Gordon, chief of security, stated that use of a spit mask is authorized on inmates who have a history of spitting or biting, such as Decedent.   (Paper 107, Ex. 22, Gordon Dep., at 52).

The first step in the deliberate indifference analysis requires a finding that the defendant subjectively recognized a substantial risk of harm.   There is no evidence that Defendants were aware either (a) that tying the spit mask or (b) that using a

---

[12] Defendants' use of the spit mask will be analyzed under the deliberate indifference standard rather than the excessive force standard because Plaintiffs object to the *way* the spit mask was used, tied in the back and after several applications of pepper spray, not to the use itself.   *See also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (applying deliberate indifference standard to use of spit mask).

spit mask in conjunction with pepper spray placed Decedent in a substantial risk of harm.[13]   "[T]o the extent the officers recognized any risk at all, we are concerned with the risk as they perceived it, not as a reasonable officer under the circumstances should have perceived it, [*Rich v. Bruce*, 129 F.3d 336,] 339-40 [(4th Cir. 1997)], *Brown* [*v. Harris*], 240 F.3d [383,] 390-91 [(4th Cir. 2001)], and not as it now may be perceived enlightened by the benefit of hindsight, *Grayson*, 195 F.3d at 695." *Parrish*, 372 F.3d at 303-04.

The Defendants involved in putting the spit mask on Decedent were Clise and Shreve: Clise held Decedent while Shreve put the spit mask over his head.  (Paper 107, Ex. 40, Clise Dep., at 50). Shreve testified that he had read the warnings included in the spit mask instructions prior to using it on Decedent.  (Paper 107, Ex. 4, Shreve Dep., at 105).  Thus, Shreve recognized that there was a general risk associated with using a spit mask.  *See Parrish*, 372 F.3d at 305 (distinguishing between recognition of general risk and incremental risk in subjective awareness analysis).  He believed that the proper way to secure the mask was to tie the straps loosely in the back.  (Paper 107, Ex. 4, Shreve Dep., at 107).

---

[13]   Plaintiffs argue strenuously that Defendants improperly tied the mask behind Decedent's head.  Defendants state that the mask was untied.  This factual discrepancy is ultimately immaterial because even if the mask was tied, there is no evidence that Defendants subjectively recognized that tying the mask placed Decedent in a substantial risk of harm.

Shreve believed that the spit mask did not impede the wearer's ability to breathe: "They can still hear verbal commands, still see.   They're not going to be stumbling and bumping into anything and they can breathe."   (Paper 107, Ex. 4, Shreve Dep., at 107). There is no evidence that Clise knew any of the risks associated with spit masks and Clise did not hear Decedent coughing prior to the use of this spit mask.   There is simply no evidence that Defendants appreciated "the incremental risk that they themselves created" either by tying the straps of the mask or by using the mask in conjunction with pepper spray.   *See Parrish*, 372 F.3d at 305.

In *Parrish*, police officers placed a similar spit mask over the head of a heavily-intoxicated arrestee, who had vomited earlier that evening.   During transportation to the detention center, the arrestee vomited and later died from aspiration of gastric content and asphyxiation.   *Id*. at 296-97.   The Fourth Circuit found that the officers did not have the requisite subjective awareness because there was no evidence,

> that the officers were aware of the distinct
> risk created by leaving the spit mask on [the
> decedent].   None of the officers have stated
> that they viewed the mask as increasing the
> risk to [the decedent], and there is no
> evidence that EMT Earl (or anyone else who may
> have been present from the time the spit mask
> was placed over [the decedent's] head until
> the time [the decedent] left the station)
> warned the officers of any such risk.

*Parrish*, 372 F.3d at 305.   Similarly, there is no evidence here that the officers were aware that the spit mask was incrementally more dangerous when it was tied in the back or when it was used in conjunction with pepper spray.   Defendants lacked the subjective awareness to establish the first prong of the deliberate indifference standard.   Thus, there was no constitutional violation associated with the use of the spit mask and Defendants are entitled to summary judgment on this point.

## 2.  Access to Medical Care at Housing Unit 4

Plaintiffs allege that Defendants Shreve and the extraction team were deliberately indifferent to Decedent's medical needs when they did not treat him immediately after the cell extraction. After the cell extraction, Decedent was taken to the medical room of Housing Unit 4.   The video shows Nurse Whisner asking Decedent "You alright? . . . Iko . . . Can you hear me . . . Do you want me to clean you up? . . . You have to answer me . . . You won't answer me?" for approximately one and a half minutes.   (Paper 101, Ex. 41).   Decedent did not respond to Nurse Whisner's inquiries. Decedent then visibly collapsed forward and was set upright by the officers flanking him.   Nurse Whisner interpreted Decedent's silence as a refusal of medical treatment (paper 101, Ex. 51, Whisner Dep., at 47) and did not treat or decontaminate Decedent in any way.   He was then placed in a wheelchair and transported to SOH.

The Maryland Division of Correction Directive on the use of force directed that "medical treatment *shall* be given to all persons exposed to chemical agents." (Paper 107, Ex. 43, at 8) (emphasis added). Defendant Gordon, chief of security, also stated that immediately after a cell extraction, an inmate is supposed to be seen by a nurse and have his vital signs checked. (Paper 107, Ex. 22, Gordon Dep., at 55). In discussing why use of a chemical agent is sometimes a "more humane and effective" option than "flesh to flesh confrontation with an inmate," the Fourth Circuit noted the importance of promptly washing off the residue of the chemical agent. *Williams*, 77 F.3d at 763 ("prompt washing of the maced area of the body will usually provide immediate relief from pain.").

Plaintiffs have set forth sufficient proof to raise a genuine issue of material fact regarding whether the extraction team Defendants were deliberately indifferent to Decedent's serious medical needs by failing to decontaminate or treat him immediately after the cell extraction. Defendants were subjectively aware that Decedent was at a substantial risk of harm.[14] Each member of the extraction team knew Decedent had been exposed to a large quantity of pepper spray only moments before and that the prison's policies required medical treatment for anyone exposed to chemical agents.

---

[14] The deliberate indifference standard requires that the subjective component be addressed for each officer individually. Each member of the extraction team had substantially the same knowledge of the risk of harm to Decedent.

42

Each member also observed Decedent collapse forward, a clear sign that he was, or likely could have been, in medical distress. Nevertheless, Defendants did not instruct Nurse Whisner to examine Decedent.[15]   Mr. Martin stated that the delivery of health care within a prison is a joint effort between security staff and medical personnel and that both parties failed to meet their obligations in this case.   (Paper 107, Ex. 1, Martin Report, at 20).   In the supervisor liability context, the court acknowledged that prison supervisors are "entitled to rely upon their health care providers' expertise" in declining to offer certain medical treatment to prisoners. *Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990).   That case is distinguishable from the facts here, however, because the inmate in *Miltier* was *actually examined* by the health care provider.   Nurse Whisner did not examine Decedent at all, she merely asked him whether he would like her to clean him. Defendants, fully aware that she had not examined Decedent, were not entitled to rely on her judgment.   The evidence supports Plaintiffs' allegation that Defendants consciously disregarded a known risk of harm to Decedent by failing to insist that he be examined by Nurse Whisner.

Nor are Defendants entitled to qualified immunity under these circumstances.   The law is well-settled that inmates are entitled

---

[15] While Decedent did not request treatment, neither did he affirmatively refuse it.   Decedent had not been verbally communicative prior to or during this incident.

43

to adequate medical care.  Furthermore, the existing case law and the prison's own policies stress the importance of decontaminating a prisoner after chemical agents are used against him. Additionally, Martin stated that Defendants' failure to ensure that Decedent was examined and decontaminated after the use of a chemical agent violated professional standards for access to health services in prison.  (Paper 107, Ex. 1, Martin Report, at 9). Defendants' motion for summary judgment on this issue will be denied.

### 3.  Access to Medical Care at SOH

Plaintiffs allege that Defendants Jacobs, Defibaugh, Hall, Tichnell, and Zang were deliberately indifferent to Decedent's medical needs while he was in the holding cell in SOH.  Defendant Gordon, chief of security, stated that in SOH nurses make regular rounds and are supposed to check inmates' vital signs during those rounds.  (Paper 107, Ex. 22, Gordon Dep., at 55).  It is undisputed that nurses were prohibited from entering Decedent's cell at SOH.

Defendant Defibaugh was the officer in charge of SOH at the beginning of Decedent's brief stay there.  At the beginning of Defibaugh's watch, he observed Decedent every couple of minutes. (Paper 107, Ex. 49, Defibaugh Dep., at 57).  Defibaugh yelled at Decedent to try to get his attention in order to remove Decedent's flex-cuffs.  After observing no response for a period of time, Defibaugh called Captain Dicken, the duty captain during that

shift, because he felt that Decedent needed to be checked. (Paper 107, Ex. 49, Defibaugh Dep., at 60). Dicken dispatched Defendant Jacobs to provide assistance to Defibaugh. Defibaugh also called Defendant Sergeant Allan Hall and medical personnel.

When Defendant Jacobs arrived at Decedent's cell, he "hollered" and "kicked on the door" to try to get Decedent's attention. (Paper 101, Ex. 57, Jacobs Dep., 53). Jacobs testified, "we're kicking and knocking, that kind of stuff, I kind of thought if we - if we hit that door hard enough, I could see some kind of a motion, but I didn't . . . that's why I went back to the telephone, to call these guys to say get me someone down here and let's go in and check him out." (Paper 101, Ex. 57, Jacobs Dep., 53). Hall told Defibaugh to open the door so he and the nurses could go in and check on Decedent. (Paper 101, Ex. 56, Hall Dep., at 44). Jacobs responded that they could not go in until they had enough support. (*Id.*).

Jacobs called Captain Dicken to request backup to enter Decedent's cell. He told Captain Dicken that Decedent did not "look real responsive." (Paper 101, Ex. 57, Jacobs Dep., at 49). There is a dispute of fact as to whether Dicken was aware that medical personnel were at Decedent's cell. Jacobs testified that he told Dicken that the nursing staff was there and that they thought Decedent was breathing. (Paper 101, Ex. 57, Jacobs Dep., at 49-50). Dicken stated, however, that during his telephone call

45

with Jacobs "there was no mention about medical personnel and there was no mention that medical personnel were on the scene and wanted to enter the cell.  I did not know anything then about medical personnel being at Inmate Iko's cell." (Paper 101, Ex. 61, Dicken Decl. ¶ 5).

There is also a question of fact as to Tichnell's role in the conversation between Dicken and Jacobs and exactly what he said. Captain Dicken stated that he repeated Jacobs's "question as to entering" Decedent's cell and that Tichnell, "who was also working in the Captain's office spoke up and said, '[n]o, we are not going in that cell.'" (Paper 101, Ex. 61, Dicken Decl. ¶ 4).  Tichnell stated that Captain Dicken requested his opinion, asking "what are we doing back here with Iko," and that he replied, "leave him alone until we can get him to comply." (Paper 101, Ex. 37, Tichnell Dep., at 61).  Jacobs stated that he heard Tichnell say: "If he's breathing, if you can see movement, he likes to lure people in, leave him alone, he'll be ok." (Paper 101, Ex. 57, Jacobs Dep., 50).

Tichnell testified that prior to his order not to check on Decedent, he was unaware that the officers were concerned about Decedent's health or that medical personnel had requested access to Decedent.  (Paper 101, Ex. 37, Tichnell Dep., at 63-64).  Captain Tichnell stated:

> There was nothing relayed to me at all that
> Mr. Iko was in any distress for me to make the

46

```
statement that I made.  Of course if I felt
that he was in distress it would have been a
totally  different  response  I  would  have
provided, but at no time did I think Mr. Iko
was in any distress[.]
```

(Paper 101, Ex. 37, Tichnell Dep., at 61).  When Defibaugh's shift

ended, he was replaced by Officer Merling.  Officer Merling noticed

that Decedent was lying in a "very odd" position and called

Defendant Zang to come look at him.  Merling specifically stated

that he did not express any urgency to Zang at this time because

Decedent appeared to be alive.  (Paper 107, Ex. 58, Merling Dep.,

at 50).  Approximately 20 minutes later, Zang arrived at Decedent's

cell, promptly entered, and began life-saving procedures.

The deliberate indifference standard requires that an officer

"knows of and disregards" a substantial risk of harm to the inmate.

*Farmer*, 511 U.S. at 837.  "This subjective component must be

addressed for each officer individually."  *Garretson v. City of

Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)

### a.  Defendant Defibaugh

Defendant Defibaugh knew of a substantial risk of harm to

Decedent but he did not consciously disregard that risk and he is

thus entitled to judgment.  Defibaugh's subjective awareness of the

risk to Decedent may be inferred from his calls to Captain Dicken,

Defendant Hall, and medical personnel to request help.  By the same

token, those calls requesting help demonstrate that Defibaugh did

not consciously disregard the substantial risk of harm to Decedent.

47

Defibaugh had been instructed by Shreve not to enter Decedent's cell by himself because Decedent was very strong and had been violent in the past.  It was reasonable for Defibaugh to obey Shreve's order.  Defibaugh followed the chain of command within the prison by calling his superior, Captain Dicken, for further instruction because he believed Decedent needed help.  It was reasonable for Defibaugh to follow Captain Dicken's order not to enter Decedent's cell.  The fact that Defibaugh followed Captain Dicken's order not to enter, despite his knowledge that Decedent was in a substantial risk of harm, at most amounts to negligence. Mere negligence is insufficient to meet the exacting deliberate indifference standard.  *See Grayson*, 195 F.3d at 695.

### b.  Defendant Jacobs

Defendant Jacobs is entitled to judgment for the same reasons as Defibaugh.  Jacobs was aware that Decedent was in a substantial risk of harm.  Consequently, Jacobs called Captain Dicken and repeatedly requested back-up so that he could enter Decedent's cell.  Jacobs also testified that he stated that nurses were present (paper 101, Ex. 57, Jacobs Dep., at 49-50), thus alerting Captain Dicken that Decedent was in possible medical distress. That Jacobs followed Captain Dicken's order not to enter Decedent's cell at most amounts to mere negligence and did not violate Decedent's constitutional rights.

48

### c.  Defendant Hall

Defendant Hall is likewise entitled to judgment because he lacked the necessary subjective awareness that Decedent was in a substantial risk of harm.  Defibaugh called him reporting that Decedent was unresponsive and Hall immediately joined Defibaugh at Decedent's cell.  (Paper 101, Ex. 56, Hall Dep., at 43).  Hall offered to go into Decedent's cell but was told by Jacobs to wait until they had additional backup.  (*Id*. at 44).  Hall and the nurses observed Decedent for approximately ten minutes and all three observed him breathing.  (*Id*. at 49-50).  After Jacobs informed them that they would not be permitted to enter Decedent's cell, Hall confirmed with the nurses that Decedent was breathing and then left the area.  (*Id*. at 50).  Hall's testimony indicates that he believed Decedent was breathing, and not in a substantial risk of harm, when he left.

### d.  Defendant Tichnell

Defendant Tichnell's alleged liability is based on the fact that he told Captain Dicken not to let anyone inside Decedent's cell.  Tichnell testified that he had no knowledge that Decedent was in medical distress (paper 101, Ex. 37, Tichnell Dep., at 61) or that medical personnel had requested access to Decedent (*id*. at 63-64).  Jacobs testified that he told Captain Dicken that the nurses were present at Decedent's cell, but there is no evidence that Captain Dicken repeated that information to Tichnell.

Tichnell was not deliberately indifferent to Decedent's serious medical needs because he lacked a subjective awareness that Decedent was in a substantial risk of harm.

### e.  Defendant Zang

Defendant Zang is entitled to judgment because he was not deliberately indifferent to Decedent's medical needs.  His 20 minute delay in arriving at Decedent's cell was not unreasonable given that Officer Merling expressed no urgency in his request that Lieutenant Zang look at Decedent.  Moreover, once Zang arrived at Decedent's cell he immediately entered, checked for a pulse, and began life-saving procedures.  Therefore, Zang did not disregard a known risk to Decedent's health.  Indeed, he acted on the risk immediately.  Zang was not indifferent to Decedent's medical needs, much less deliberately indifferent.

## D.  Supervisor Liability

Plaintiffs allege that Defendant Shreve and Defendant Galley, warden, should be held responsible under a theory of supervisory liability.[16]  Plaintiffs allege that Defendant Shreve permitted and ratified a pattern and practice of widespread abuse in Housing Unit

---

[16] Defendants only mention the theory of supervisory liability in their Reply, arguing only that, without a basis for finding any constitutional violation, there can be no supervisory liability. Furthermore, they refer to Defendant Gordon, rather than Defendant Shreve.  (Paper 113, at 14).

4 and Defendant Galley established policies and procedures that allowed certain alleged constitutional violations.[17]

Section 1983 supervisory liability requires an underlying constitutional violation by the supervisor's subordinate. *See Young v. City of Mt. Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) (citing *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) ("A claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised.")).

The Fourth Circuit has set forth three elements necessary to establish supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate

---

[17] Specifically, Plaintiffs allege that Galley established policies and procedures that:

> (i) allowed officers to use as much chemical agent as officers wanted, (ii) prohibited the calling off of a cell extraction once it was initiated, (iii) authorized the use of force against a passive inmate that was not a threat to himself or others, (iv) allowed security staff to take no action whatsoever to ensure inmates' medical needs are taken care of other than to present the inmate to medical staff, (v) permitted the use of a spit mask at the total discretion of correctional officers, (vi) allowed the spit mask to be used without regard for its conditions of use and regulations, and (vii) permitted officers to place tremendous and lengthy pressure on a restrained and passive inmate.

(Paper 107, at 41).

> was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiffs' general allegation that Shreve permitted and ratified a pattern and practice of widespread abuse in Housing Unit 4 cannot stand as a separate claim, divorced from the specific constitutional violations alleged because it is not sufficiently related to the harm suffered by Decedent. *See Shaw*, 13 F.3d at 799 (plaintiff must demonstrate "an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff."). Based on the preceding discussion, the only alleged constitutional violations that survive summary judgment are Defendant Shreve's use of pepper spray, the extraction team's deliberate indifference to Decedent's medical needs immediately following the cell extraction, and the pressure hold while flex cuffs were obtained.

Supervisory liability may not be imputed to Defendant Galley on these potential violations. First, the evidence shows that the prison's written policies did not "allow[] officers to use as much chemical agent as officers wanted" as alleged by Plaintiffs. The

policy directed that "[o]nly the <u>minimal</u> amount of chemical agents may be used in a given situation" and that "[m]edical treatment shall be given to all persons exposed to chemical agents." (Paper 107, Ex. 43, at 7-8) (emphasis in original).  Second, Plaintiffs have failed to establish the first element set forth in *Shaw* that requires a plaintiff to show the supervisor's knowledge of a subordinate's conduct, where that conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions." *Shaw*, 13 F.3d at 799. Plaintiffs have offered no evidence showing that the excessive use of pepper spray was a widespread occurrence such that Galley had knowledge of this unreasonable and pervasive risk of harm.  Nor have Plaintiffs offered evidence that inmates were regularly subjected to excessive pressure holds or deprived of medical care either after a forced cell extraction or after the use of chemical agents.  Without the constructive or actual knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of harm, Galley's alleged inaction cannot amount to tacit authorization of that harmful conduct.

If Shreve is not directly liable on the deliberate indifference claim, he may be liable as a supervisor.  Section 1983 liability on the part of the supervisory defendants in the

deliberate indifference to medical need context requires a showing that: (1) the supervisory defendants failed promptly to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations.  *Miltier*, 896 F.2d at 854.  As the leader of the extraction team, Shreve failed promptly to provide Decedent with needed medical care.  Additionally, Shreve directly observed Nurse Whisner's failure to treat Decedent and tacitly authorized this decision by proceeding to move Decedent to SOH without insisting that Nurse Whisner examine Decedent.  This evidence is sufficient to preclude summary judgment on Shreve's liability as a supervisor.

## V.  Maryland Constitutional and Common Law Torts[18]

### A. Statutory Immunity

State personnel are immune from suit and from liability for tortious conduct committed within the scope of their public duties and without malice or gross negligence if the State has waived

---

[18] Counts II (Maryland Constitution) and VII (Gross Negligence) are brought by Christine Iko and Benny Iko, Decedent's children, and by Dr. Benny O. Iko as personal representative of the Estate of Decedent.  Counts III (Assault and Battery) and IV (Intentional Infliction of Emotional Distress) are brought only by Dr. Iko as personal representative of the Estate of Decedent.

sovereign immunity.  *See* Md.Code Ann., Cts. & Jud.Proc. § 5-522;

Md.Code Ann., State Gov't § 12-104(a).

> Under Maryland law, the malice necessary to
> defeat immunity under § 5-522 is what is often
> referred to as "actual malice" – that is,
> conduct "motivated by ill will, by an improper
> motive, or by an affirmative intent to
> injure." *Shoemaker v. Smith*, 353 Md. 143
> (1999).  A similarly high threshold must be
> crossed to establish gross negligence – the
> defendant must have "acted with wanton or
> reckless disregard for the safety of others."
> *Boyer v. State*, 323 Md. 558, 594 A.2d 121, 132
> (1991); *cf. State v. Albrecht*, 336 Md. 475,
> 649 A.2d 336, 348 (1994) (defining gross
> negligence as conduct "so heedless and
> incautious as necessarily to be deemed
> unlawful and wanton, manifesting such a gross
> departure from what would be the conduct of an
> ordinarily careful and prudent person under
> the same circumstances so as to furnish
> evidence of an indifference to consequences."
> (citation and internal quotation marks
> omitted)).

*Young*, 238 F.3d at 578-79.  Defendants assert statutory immunity as

to Counts II, III, IV, and VII.  (Paper 101, at 44).

**B. Constitutional Claims**

Plaintiffs allege in Count II that Defendants violated the

rights guaranteed to Decedent under Articles 24 and 25 of the

Maryland Constitution.[19]  Article 24 and Article 25 are construed

---

[19] Article 24 provides that "no man ought to be taken or
imprisoned or disseized of his freehold, liberties or privileges,
or outlawed, or exiled, or, in any manner, destroyed, or deprived
of his life, liberty or property, but by the judgment of his peers,
or by the Law of the land."  Md. Const. Decl. of Rights, art. 24.

Article 25 provides that "excessive bail ought not to be required,
(continued...)

*in pari materia* with their federal counterparts, the Fourteenth Amendment and the Eighth Amendment, respectively. *See Kirsch v. Prince George's County*, 331 Md. 89, *cert. denied*, 510 U.S. 1011 (1993) (construing due process and equal protection rights embodied in Article 24 *in pari materia* with comparable rights in Fifth and Fourteenth Amendments); *Aravanis v. Somerset County*, 339 Md. 644 (1995), *cert. denied*, 516 U.S. 1115 (1996) (Article 25 *in pari materia* with Eighth Amendment).

Defendants argue that they did not violate Decedent's Fourteenth Amendment rights and, accordingly, did not violate his rights under Article 24.  Defendants further argue that the Maryland Court of Appeals has never held that a private tort action is proper to redress alleged violations of Article 25 and thus no such tort exists and they are entitled to judgment on that portion of the claim.

In *Ashton v. Brown*, 339 Md. 70, 100 (1995), the Court of Appeals of Maryland noted that different rules apply with respect to the remedies available for violations of the federal and state constitutions because the right of recovery for federal violations arises from statute – § 1983 – whereas the redress for state violations is through a common law action for damages.

---

[19](...continued)
nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law." Md. Const. Decl. of Rights, art. 25.

In *DiPino v. Davis*, 354 Md. 18 (1999), Davis, an arrestee, brought a number of federal and state constitutional claims against DiPino, a police officer, including claims under the Eighth Amendment and Article 25.  The court stated:

> For convenience, we shall speak in general terms when referring to State Constitutional violations. . . . We do not mean in any way to suggest that an action for damages lies for the violation of all provisions of the [Maryland] Constitution or Declaration of Rights; it may or may not, but that is not before us in this case.  We are dealing here with claims under Articles 21, 24, 25, 26, and 40 of the Declaration of Rights.

*DiPino*, 354 Md. at 51 n.7.  The court thus implied that an action for damages does lie for violations of the Articles it enumerated, including Article 25.  The court noted separately,

> We have considerable difficulty understanding how anything DiPino may have done constituted a violation of Davis's rights to . . . reasonable bail, or to be free from cruel and unusual punishment under the Federal or State Constitutions, but those issues are not before us in this appeal.  They can be dealt with by the circuit court on remand.

*DiPino*, 354 Md. 44 n.4.  That the court remanded the state constitutional claim for cruel and unusual punishment further supports a finding that a private right of action exists under Article 25.  At this juncture, the court will assume that a private

right of action exists under Article 25 and will reject Defendants'
argument to the contrary.[20]

As in federal law, Maryland follows the principle of statutory
construction that "a specific statutory provision governs over a
general one." *See Lumbermen's Mut. Cas. Co. v. Ins. Com'r.*, 302
Md. 248, 268 (1982).  Where one statutory provision specifically
addresses a matter, and another more general statutory provision
also may cover the same matter, "the specific statutory provision
is held to be applicable and the general provision is deemed
inapplicable."  *Id.*  For this reason, Plaintiffs' state
constitutional claims will be analyzed solely under the more
specific provision of Article 25.  As explained above, "it is now
well established that the Eighth Amendment serves as the primary
source of substantive protection to convicted prisoners, and the
Due Process Clause affords a prisoner no greater substantive
protection than does the Cruel and Unusual Punishments Clause."
*Williams*, 77 F.3d at 768.  The same facts and analysis that applied
to Plaintiffs' Eighth Amendment claims brought under § 1983 apply
with equal force to their state constitutional claims brought under
Article 25.  Therefore, Defendants' motion for summary judgment on
Count II will be denied with respect to Shreve's use of pepper

---

[20] In a footnote in their opposition, Plaintiffs recognize that
only one provision of the Maryland Declaration of Rights applies,
and that it should be interpreted in pari materia with the federal
claim. They, however, state that  Article 24, rather than Article
25, is the proper provision.  (Paper 107, at 42 n.30).

spray, the pressure hold, and the extraction team's deliberate indifference to Decedent's medical needs immediately following the cell extraction, and granted with respect to all other claims.

Defendants assert statutory immunity to Count II. "Unlike in a § 1983 action and unlike in an action for some common law torts, neither the local government official nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution." *DiPino*, 354 Md. at 51 (citing *Clea v. City of Balt.*, 312 Md. 662, 669-71 (1988)).

## C.  Assault and Battery (Count III)

Plaintiffs allege that Defendants committed assault and battery against Decedent by "using excessive chemical agents, intentionally and unlawfully beating Decedent, placing a mask on his face and using excessive force to restrain and transport him." (Paper 87 ¶ 40).

Under Maryland law, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 601 (1999). "The intent element of battery requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Id.* at 602. A "law enforcement officer is not liable for assault and battery or other tortious conduct performed during the course of his official duties

unless he acted with actual malice toward the plaintiff, *i.e.* with ill will, improper motivation or evil purpose." *Goehring v. United States*, 870 F.Supp. 106, 108 (D.Md. 1994) (internal quotations omitted). "[A]ssault and battery can only occur when there is no legal authority or justification for the arresting officer's actions." *Hines v. French*, 157 Md.App. 536, 551 (2004).

First, Plaintiffs have not alleged any facts nor put forth any evidence that Defendants beat Decedent. Second, as explained above, the use of the spit mask was legally justified and Defendants did not use excessive force to restrain and transport Decedent from Housing Unit 4 to SOH. Thus, the only remaining questions are whether Shreve is entitled to immunity for his use of pepper spray and whether those involved in the pressure hold acted with actual malice. Plaintiffs have not put forth any evidence to establish that Shreve or the others acted with actual malice. As Plaintiffs correctly note, however, gross negligence may also defeat immunity. *See Lynn v. O'Leary*, 264 F.Supp.2d 306, 311 (D.Md. 2003) (denying government official immunity for state law claims of assault and battery, negligent failure to train/supervise, intentional infliction of emotional distress, and conversion because amended complaint sufficiently alleged gross negligence). The court explained above that there is a genuine issue of fact whether Shreve's use of pepper spray was wanton and unnecessary. Thus, there is a genuine issue of fact as to whether

Shreve or the others acted with wanton or reckless disregard for the safety of Decedent, *i.e.*, whether he acted with gross negligence.  Defendants have not established that they are entitled to governmental immunity on the assault claim as it relates to his use of pepper spray or the hold in SOH. Accordingly, Defendants' motion for summary judgment will be denied on this count.

## D. Intentional Infliction of Emotional Distress (Count IV)

Plaintiff Dr. Iko, as personal representative of the estate of Decedent, brings this claim for intentional infliction of emotional distress.  Plaintiffs assert that Defendants' threat of physical violence, use of force, and deprivation of medical attention was extreme and outrageous and that, as a result of this conduct, Decedent suffered extreme and severe emotional distress.

The elements of the tort for intentional infliction of emotional distress are: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Harris v. Jones,* 281 Md. 560, 566 (1977).  *See also Silkworth v. Ryder Truck Rental, Inc.*, 70 Md.App. 264, 271 (1987) (recognizing that the elements of this tort "are stringent standards, and each must be pled and proved with particularity").  Although the "tort of intentional infliction of emotional distress is rarely viable, and is to be used sparingly," *Bagwell v. Peninsula Reg'l Med. Ctr.*,

106 Md.App. 470, 514 (1995), "the extreme and outrageous character
of the defendant's conduct may arise from his abuse of a position,
or relation with another person which gives him actual or apparent
authority over him, or power to affect his interests." *Harris*, 281
Md. at 569.

To meet the requirements of the tort, "the defendant's conduct
must have been so outrageous that it goes beyond all possible
bounds of decency, and is regarded as atrocious, and utterly
intolerable in a civilized community." *Borchers v. Hrychuk*, 126
Md.App. 10, 18 (1999) (internal quotations omitted). "[T]he
defendants' conduct is intentional or reckless where he desires to
inflict severe emotional distress, and also where he knows that
such distress is certain, or substantially certain, to result from
his conduct; or where the defendant acts recklessly in deliberate
disregard of a high degree of probability that the emotional
distress will follow." *Id.* at 567. "Under Maryland law, an
intentional infliction of emotional distress plaintiff must show
the 'truly devastating effect' of the conduct they were subjected
to by proving an emotional response 'so acute that no reasonable
person could be expected to endure it.'" *Rich v. United States*,
158 F.Supp.2d 619, 630 (D.Md. 2001) (quoting *Pemberton v. Bethlehem
Steel Corp.*, 66 Md.App. 133, 161 (1986)).

Defendants merely assert that "their conduct on April 30, 2004
was a wholly lawful exercise of correctional authority." (Paper

101, at 43).   Taking the facts in the light most favorable to Plaintiffs, as we must, Defendants' use of pepper spray, use of the pressure hold, and deprivation of medical attention could be considered reckless, extreme, and outrageous, given the custodial nature of the relationship between Defendants and Decedent; thus satisfying the first and second elements of the tort.   Summary judgment will be denied on this claim.

**E. Gross Negligence (Count VII)**

Plaintiffs allege in Count VII that Defendants owed Decedent a duty to exercise reasonable care not to act in a manner that unreasonably threatened the health and safety of Decedent, including refraining from causing him serious physical harm and ensuring that he received prompt medical care and treatment as needed.   (Paper 87 ¶ 54).   Plaintiffs allege that Defendants breached that duty by using excessive force, failing to provide Decedent with medical attention, and otherwise recklessly causing Decedent to sustain injury that resulted in his death.

Quoting *Romanesk v. Rose*, 248 Md. 420, 423 (1968), the Court of Special Appeals of Maryland defined gross negligence as:

> An intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.   Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly

> indifferent to the rights of others that he
> acts as if such rights did not exist.

*Marriott Corp. v. Chesapeake & Potomac Tel. Co. of Md.,* 124 Md.App.
463, 478 (1998).   The state has a duty to protect those in its
custody, including inmates.   *Pendleton v. State*, 398 Md. 447, 476
(2007) (citing *Estelle*, 429 U.S. at 103 (duty to provide medical
needs to inmate)).   As the preceding discussion illustrates, there
are questions of fact as to whether Defendants breached their duty
to protect Decedent.   Summary judgment will be denied on Count VII.

**V. Conclusion**

For the foregoing reasons, Defendants' motion for summary
judgment will be granted in part and denied in part, the motion to
strike the report of Steve J. Martin will be denied and the motion
to strike inmate letters will be denied as moot.   A separate Order
will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

64